Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
Paul S. Chan - State Bar No. 183406
    pchan@birdmarella.com
Alexander H. Tran - State Bar No. 338940
    atran@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff Delinea Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DELINEA INC., <br><br> Plaintiff, <br><br> vs. <br><br> SAVIYNT, INC.; PATRICK WADLAND, an individual, and DOES 1-25, <br><br> Defendants. | CASE NO. 2:25-cv-09040 <br><br> **[REDACTED] PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> *(Filed Concurrently With [Proposed] Order Granting Plaintiff's Motion For Temporary Restraining Order and Order to Show Cause re. Preliminary Injunction; Declaration Of Sarah Chapin; Declaration Of Mike Cassady; Declaration of Nate Boettcher; Declaration of Paul S. Chan)* <br><br> Date: <br> Time: <br> Crtrm.: |

4082762.6

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on September 23, 2025, at the above-captioned Court, located at 350 W 1st Street, Los Angeles, CA 90012-4565, and the judicial officer to be assigned to this matter, pursuant to Civil Local Rule 7-19 and Federal Rule of Civil Procedure 65(b), Plaintiff Delinea Inc., ("Plaintiff" or "Delinea") will and hereby does apply *ex parte* for:

A.      A Temporary Restraining Order ("TRO") to temporarily restrain and enjoin Defendant Patrick A. Wadland ("Wadland") and Defendant Saviynt, Inc. ("Saviynt") (collectively, "Defendants") from the actions set forth more fully in the Proposed Order Granting Plaintiff's Motion For Temporary Restraining Order and Order to Show Cause re. Preliminary Injunction filed herewith, which include (but are not limited to): (1) accessing or attempting to access Plaintiff's proprietary computer network; and (2) directly or indirectly using, disclosing, copying or retaining any of Plaintiff's Confidential Information or trade secrets.

B.      An Order to Show Cause why a Preliminary Injunction should not issue, regarding the same.

There is good cause for this application, which seeks to halt Defendants' unauthorized computer accessing and misappropriation of Delinea's confidential, proprietary, and trade secret information.  Defendant Wadland resigned from Delinea in April 2025 to join Defendant Saviynt, a direct competitor.  Delinea has recently discovered that immediately after resigning, Wadland secretly and repeatedly infiltrated a Delinea proprietary computer system dozens of times, including by using an IP address registered to Saviynt in El Segundo, California, in order to access and/or download extensive amounts of Delinea proprietary information.  Delinea has been and will be irreparably harmed by Defendants' unauthorized accessing and misappropriation of its confidential, proprietary and trade secret information, which conduct violates (among others) the Computer Fraud and Abuse Act, the Defend Trade Secrets Act, and Defendant Wadland's

4082762.6

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

confidentiality and employment agreements with Delinea.  Because the information improperly removed from Delinea was in an electronic format that can be quickly and easily disseminated to a large number of entities, copied, uploaded onto other computers, or forwarded to other individuals, expedited injunctive relief is necessary.

This *Ex Parte* Application is based on this Notice of *Ex Parte* Application, the accompanying Memorandum of Points and Authorities, the supporting Declarations of Sarah Chapin, Mike Cassady, Nate Boettcher and Paul S. Chan and exhibits thereto, all other papers and pleadings on file, and such additional arguments and evidence as may be presented to the Court at or before a hearing on this *Ex Parte* Application and/or the Order to Show Cause and preliminary injunction sought therein.

Notice of this *ex parte* application was provided to Defendants on September 23, 2025, by telephone voicemail, email, Federal Express mailing, and personal service, advising them of the filing and substance of Plaintiff's *ex parte* Application. (Declaration of Paul S. Chan ¶¶ 3-5.)  At the time of this filing, Defendants have not advised Plaintiff whether they would oppose Plaintiff's *ex parte* Application.

DATED:  September 23, 2025

Ekwan E. Rhow
Paul S. Chan
Alexander H. Tran
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By: _____
Paul S. Chan
Attorneys for Plaintiff Delinea Inc.

4082762.6

3

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES..................................................1

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS.......................................................................................2

      A.    The Cybersecurity Market ...........................................................................2

      B.    Plaintiff Delinea and Its Technologies........................................................2

      C.    Plaintiff Delinea Protects its Confidential Information and Trade Secrets .........................................................................................................5

      D.    Wadland's Employment and Confidentiality Agreements ...........................6

      E.    Wadland's Resignation .................................................................................7

III.    THE COURT SHOULD GRANT THE TEMPORARY RESTRAINING ORDER AND ISSUE THE OSC ............................................12

      A.    Legal Standard ............................................................................................12

      B.    Delinea is Likely to Prevail on the Merits of Its Claims. .........................13

            1.    Delinea is Likely to Succeed on its Computer Fraud and Abuse Act Claim...............................................................................13

            2.    Delinea is Likely to Succeed on its Misappropriation of Trade Secrets Claim................................................................................16

            3.    Delinea is Likely to Succeed on its Breach of Contract Claim...................................................................................................19

      C.    Delinea Will Suffer Irreparable Harm Unless Defendants are Enjoined. ....................................................................................................20

      D.    The Balance of Hardships Weighs Heavily in Favor of Delinea..........21

      E.    The Public Interest Favors Injunctive Relief .............................................22

      F.    Delinea Should Not Be Required to Post a Bond .......................................22

      G.    Delinea's Requested Relief.........................................................................22

IV.     CONCLUSION ....................................................................................................23

4082762.6

i

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC*,
No. 8:23-CV-01903-JVS-KESX, 2024 WL 1699509 (C.D. Cal.
Mar. 28, 2024) ...............................................................................14, 15

*Bodenburg v. Apple Inc.*,
146 F.4th 761 (9th Cir. 2025) ................................................................19

*Cisco Sys., Inc. v. Chung*,
462 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................17

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
No. 18-cv-1441, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ...........22

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
444 F. Supp. 3d 1198 (E.D. Cal. 2020) ................................................22

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021) ................................................................12

*Edwards Lifesciences Corp. v. Launey*,
No. 8:23-CV-00304-WLH-ADSX, 2023 WL 4680774 (C.D. Cal.
June 12, 2023)........................................................................................20

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ...............................................................15

*Google LLC v. Point Fin., Inc.*,
No. 5:25-CV-04033-BLF, 2025 WL 1616533 (N.D. Cal. June 6,
2025) ......................................................................................................12

*Henry Schein, Inc. v. Cook*,
191 F. Supp. 3d 1072 (N.D. Cal. 2016) ................................................22

*Hub Grp., Inc. v. Ortiz*,
No. 5:21-CV-00517-JWH-KK, 2021 WL 4555820 (C.D. Cal. Apr.
13, 2021) ...........................................................................................19, 22

*Ikhana Grp., LLC v. Viking Air Ltd.*,
2023 WL 7348411 (S.D. Cal. Nov. 7, 2023).........................................21

4082762.6

ii

*Mechanix Wear LLC v. Branson*,
No. 2:24-CV-03090-RGK-AJR, 2024 WL 2846068 (C.D. Cal. Apr. 23, 2024) ...................................................................................21, 22

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F. Supp. 3d 816 (N.D. Cal. 2014)........................................................ 14, 16

*Posdata Co. v. Kim*,
No. C-07-02504RMW, 2007 WL 1848661 (N.D. Cal. June 27, 2007) .........................................................................................................18

*SolarCity Corp. v. Pure Solar Co.*,
No. CV1601814BRODTBX, 2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) ......................................................................................................17

*SuccessFactors, Inc. v. Softscape, Inc.*,
544 F. Supp. 2d 975 (N.D. Cal. 2008)...............................................................14

*Tesla, Inc. v. Khatilov*,
No. 4:21-CV-00528-YGR, 2021 WL 624174 (N.D. Cal. Jan. 22, 2021) .........................................................................................................20

*Waymo LLC v. Uber Techs., Inc.*,
No. 3:17-cv-00939-WHA, 2017 WL 2123560 (N.D. Cal. May 15, 2017) ..................................................................................................... 19, 21

*Weingand v. Harland Fin. Sols., Inc.*,
No. 11-3109, 2012 WL 2327660 (N.D. Cal. June 19, 2012) ...........................14

*WeRide Corp. v. Kun Huang*,
379 F. Supp. 3d 834 (N.D. Cal. 2019)....................................................... 16, 19

**Federal Statutes**

18 U.S.C. § 1030(a)(2)(C) .....................................................................................13

18 U.S.C. § 1030(a)(4) ...........................................................................................13

18 U.S.C. § 1030(e)(2)(B) ......................................................................................14

18 U.S.C. § 1030(e)(11) ..........................................................................................14

18 U.S.C. § 1030(g)................................................................................................13

18 U.S.C. § 1839(3)(B)............................................................................................16

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

18 U.S.C. § 1839(5)-(6) ................................................................................... 17

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* .............................. *passim*

Defend Trade Secrets Act, 18 U.S.C. § 1861 *et seq.* ...................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 65(b) ........................................................... 2

C.D. Cal. Local Rule 7-19 ............................................................................... 2

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Delinea Inc. ("Delinea" or the "Company") applies for this Temporary Restraining Order ("TRO") and Order to Show Cause re Preliminary Injunction ("OSC") against its former employee, Defendant Patrick A. Wadland, and a direct competitor, Defendant Saviynt, Inc. (collectively, "Defendants"), to halt Defendants' brazen campaign of corporate theft.

Wadland, a former Director of Product Management at Delinea, announced his resignation from the Company on April 14, 2025 to work for Saviynt, a corporate competitor, developing products intended to directly compete with Delinea.  Throughout his Delinea employment, Wadland signed multiple agreements acknowledging his confidentiality and non-disclosure obligations and his understanding that they continued even after his separation.

But immediately after resigning, without Delinea's knowledge or consent – and in direct violation of his confidentiality and non-disclosure obligations – Wadland secretly embarked on a scheme to steal, misappropriate, and misuse Delinea's confidential information and trade secrets, by ***repeatedly infiltrating a Delinea proprietary computer system dozens of times***.  During these unauthorized intrusions, which in some instances lasted for hours, Wadland viewed ***and downloaded*** extensive amounts of Delinea proprietary information, including trade secrets about specific Delinea products and applications with which Saviynt seeks to compete.  This deliberate theft of Delinea proprietary computer information was conducted while Wadland was employed by Saviynt, during normal business hours, and through use of Saviynt devices – including an IP address registered to Saviynt in El Segundo, California.

These unauthorized intrusions into Delinea's proprietary computer system constitute clear violations of (among others) the Computer Fraud and Abuse Act, the Defend Trade Secrets Act, and Wadland's contractual nondisclosure obligations.

4082762.6

1

Upon discovering this misconduct in mid-August 2025, Delinea immediately disabled Wadland's legacy access to the Delinea computer system and launched a comprehensive security investigation to determine the nature and extent of the unauthorized intrusions, which was completed in September 2025.  Delinea now applies for this TRO and OSC to secure and recover its trade secret and confidential information.

## II.   STATEMENT OF FACTS

### A.   The Cybersecurity Market

The cybersecurity industry is a highly competitive market in which companies offer products and solutions to help customers protect their sensitive information from ever-increasing cyber threats amplified by the proliferation and adoption of cloud computing infrastructure.  (Declaration of Mike Cassady ("Cassady Decl.") ¶ 3.)  The task of protecting corporate assets has grown more challenging – and more important – as IT environments have become more complex and widely distributed across geographic locations and in the cloud.  (*Id.*)  The global cybersecurity market size was estimated at approximately $245 billion in 2024 and is projected to reach approximately $500 billion by 2030.  (*Id.*)

### B.   Plaintiff Delinea and Its Technologies

Delinea, formed in 2021 from the merger of two established cybersecurity companies, is in the business of providing cybersecurity solutions utilizing proprietary processes, products, and technologies to deliver a range of enterprise security software and services to its customers.  (Cassady Decl. ¶ 4.)  Specifically, Delinea is a provider of Privileged Access Management ("PAM"), Identity Security, and Identity Governance and Administration ("IGA") solutions.  PAM is a set of tools that secures, manages, and monitors privileged accounts and credentials.  (*Id.*)  Identity security is a cybersecurity practice focused on protecting digital identities (human and non-human) from unauthorized access, manipulation, or misuse through tools and processes that manage and verify these identities and control their access

4082762.6

2

to systems and data. (*Id.*) IGA refers to solutions that automate and orchestrate governance and administration of digital identities and access rights policies and procedures in an organization. (*Id.*) Within IGA, Separation of Duties ("SoD") is a security measure that involves requiring the input of more than one person in completing a critical or higher risk task. SoD solutions focus on access rights and controls across business applications for orchestrating regulatory and other compliance requirements. (*Id.*)

In April 2024, Delinea expanded its presence in the Identity Security space through the acquisition of Fastpath Solutions, LLC ("Fastpath"), a leader in IGA and identity access software that help businesses manage access risk, segregation of duties, and security across multiple applications and platforms. (Cassady Decl. ¶ 5.) As part of the Fastpath acquisition, Delinea assumed all of Fastpath's intellectual property, confidential and proprietary business and trade secret information. (*Id.*) Delinea also assumed all of the Fastpath employees and their related contracts with Fastpath. (*Id.*)

Fastpath – and its cloud-based risk and compliance management product called Fastpath Assure – are among Delinea's most valuable assets. (Declaration of Nate Boettcher ("Boettcher Decl.") ¶ 3.) With centralized, cloud-based IT General Controls, including SoD, Fastpath enables businesses to efficiently manage and secure identities, enforce robust access controls over critical business processes, and track changes in data across critical business applications. (*Id.*)

Within the Fastpath Assure platform licensed to authorized customers[1], there are ███████████████████████████████████████████████ ████████████████████████████ (Boettcher Decl. ¶ 4.) ███████████████████

---

[1] Delinea customers purchasing Fastpath Assure are subject to strict licensing and/or cloud services entitlement rights and restrictions, confidentiality and return of property restrictions. (Boettcher Decl. ¶ 11.)

4082762.6

3

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO
SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE



– to manage and automate core business processes (e.g., finance, accounting, HR, supply chain, procurement, project management) and interactions with customers (e.g., sales tracking, marketing, customer service & support, customer data).  (*Id.*)

(*Id.*)

Fastpath Assure also provides core **modules** to its customers to analyze the data recorded:

. (Boettcher Decl. ¶ 5.)  The suite of modules provides Delinea's customers the ability to analyze insights regarding the user access and risk profiles across their key business systems and presents actionable information to streamline the customer's security program to prevent over-privileged and/or risky access by users.  (*Id.*)

Together, the proprietary and confidential **risk framework and rulesets**, and custom **integrations** contained in the Fastpath Assure product represent the core configuration and architecture of one of Delinea's most valuable assets.  (Boettcher Decl. ¶ 6.)  Similarly, the **modules** provided to customers by Fastpath Assure provide customers tools to visualize and take actionable steps to protect their systems from threats.  (*Id.*)  The underlying framework (i.e., the risk framework, rulesets, and custom integrations) and the customer tools (i.e., modules) are extremely valuable and are critical to Delinea's competitive market advantage.  (*Id.*)

Delinea has invested substantial financial and other resources in the research, development, acquisition and operation of Fastpath Assure and its underlying trade secrets, proprietary and confidential information.  (Boettcher Decl. ¶ 7.)  The integration features of Fastpath Assure (including its integrations, risk framework

4082762.6

4

and rulesets and modules) are not generally known or readily ascertainable, and derive independent economic value from being Delinea's proprietary and confidential information. (*Id.*) If competitors had access to Delinea's products – including Fastpath Assure – such competitors would be able to manufacture and duplicate Delinea's products in the market, on a significantly reduced time-to-market timeline, and dilute or destroy Delinea's competitive market share. (*Id.*)

**C.     Plaintiff Delinea Protects its Confidential Information and Trade Secrets**

For Wadland to perform the functions of his job at both Fastpath and Delinea, he was given access to competitively sensitive and commercially valuable data and information constituting trade secrets under California and federal law, including, without limitation, development plans, product strategies, inventions, formulas, programs, code, methods, designs, processes, strategies, marketing and pricing policies data, risk framework and rulesets, modules, integrations, and other nonpublic information (referred to herein as "Confidential Information"). (Cassady Decl. ¶ 7.)

Delinea takes reasonable measures to protect its Confidential Information, including, but not limited to: requiring employees to sign agreements in which they agree to maintain the confidentiality of such Confidential Information and to complete annual security and data protection training and certifications; requiring current and prospective customers, and business partners to execute written agreements containing non-disclosure, protective licensing terms, and return of property provisions; password-protecting computers; limiting access to data and information; marking documents confidential; and enforcing non-disclosure agreements. (Boettcher Decl. ¶ 8.)

Delinea also maintains its Confidential Information and trade secrets on a protected and restricted private network which requires company authorization to access, a password, and multiple factor authentication. (Boettcher Decl. ¶ 9.)

4082762.6

5

Delinea also routinely conducts audits and assessments of its protected network. (*Id.*)

### D.    Wadland's Employment and Confidentiality Agreements

Wadland was employed at Fastpath from February 2020 to April 2025, and held various key positions throughout his tenure – including Director of Risk & Compliance Solutions, and Director of Product Management, Integration & Risk Solutions – which gave him direct responsibilities over, and direct access to, the Company's Confidential Information and valuable intellectual property assets, including the Fastpath Assure product.  (*See* Declaration of Sarah Chapin ("Chapin Decl.") ¶¶ 3-5.)

Throughout his employment, Wadland signed numerous agreements expressly acknowledging the importance of the Company's Confidential Information, his ongoing confidentiality and non-disclosure obligations, and his understanding that those obligations continued even after his separation, including: (1) his Confidentiality and Inventions Assignment Agreement (the "CIAA"), where he acknowledged that "the communication of … Confidential Information to third parties or the unauthorized use of such Confidential Information could irreparably injure the business of the Company" (Chapin Decl., Ex. 1 at 2); agreed that "without the prior written consent of the Company, he … will not, directly or indirectly, disclose, reveal, make known, publish, or communicate any of the Confidential Information to any third party whatsoever, or use any of the Confidential Information in any manner except in connection with the business of the Company"; and further agreed that his "obligations in this [CIAA] shall survive the termination of his or her employment with the Company for any reason."  (*Id*. at 9.); (2) his Fastpath Solutions LLC Employee Handbook (Chapin Decl., Exhibit 2 at 19-20) (similar); and (3) his Delinea Employee Handbook and Delinea Global Code of Conduct (*see* Chapin Decl., Ex. 3 (Delinea Employee Handbook), 4 (Delinea Code of Conduct)) (similar).

4082762.6

6

**E.      Wadland's Resignation**

On April 14, 2025, Wadland sent an email to Delinea personnel announcing his resignation from Delinea effective April 25, 2025.  (*See* Chapin Decl. ¶ 8; Cassady Decl. ¶ 8.)  After his announcement, Delinea personnel learned that Wadland was leaving the Company after accepting an employment offer from a direct competitor, Saviynt.  (*See* Chapin Decl. ¶ 8; Cassady Decl. ¶ 8.)  In light of this information, Delinea decided to end Wadland's employment effective immediately on April 14, 2025, but honor his salary for two weeks.  (Cassady Decl. ¶ 8.)

On April 14, 2025, Sarah Chapin, the Human Resources Director of Delinea, called Wadland to inform him of his immediate separation, and his ongoing confidentiality obligations to the Company.  (Chapin Decl. ¶ 8.)  On April 15, 2025, Wadland electronically signed his separation documents, where he again acknowledged that he was "aware of [his] ongoing obligations related to the protection of the company's confidential and proprietary information."  (*Id.* ¶ 9, Ex. 5 at 1.)

On May 9, 2025, Chapin called Wadland and reminded Wadland of his obligations under his confidentiality agreements with the Company and that such agreements prohibit any access to the Company's systems, including any of Wadland's work product while employed at the Company.  (Chapin Decl. ¶ 10.)  Wadland confirmed his understanding that he may not access the Company's systems, including any prior work product.  (*Id.*)

**F.      Wadland's Unauthorized Accessing of Delinea's Computers and Theft of Confidential Information**

Unfortunately, Wadland's repeated acknowledgments and representations to the Company about adherence to his confidentiality obligations turned out to be false.  Almost immediately after resigning, without Delinea's knowledge or authorization – and in direct contravention of his multiple confidentiality

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

agreements – Wadland initiated a campaign to repeatedly infiltrate Delinea's computer systems to improperly view, access, and download Delinea Confidential Information and trade secrets for the Fastpath Assure product.

On August 18, 2025, Delinea learned that Wadland had continued to access a Fastpath computer system on an unauthorized basis after his employment had ended, and indeed had accessed the system on repeated occasions between April and August 2025.  (Cassady Decl. ¶ 9.)

Following a comprehensive investigation by Delinea's Security Operations and engineering team in late August and September 2025, Delinea learned that starting on April 23, 2025, Wadland used a legacy Fastpath Entra ID account to illicitly continue to access an internal Fastpath system containing Delinea proprietary information and trade secrets.  (*See* Boettcher Decl. ¶ 13.)[2]  Delinea disabled the legacy ID account upon learning of the unauthorized intrusions on August 18, 2025.  (Cassady Decl. ¶ 9.)  According to activity logs reviewed in the security investigation, Wadland accessed the Fastpath system on no less than ***31 distinct days*** between April 23 and August 12, 2025, all during Monday to Friday business days during ordinary business hours.  (Boettcher Decl. ¶ 14.) Approximately 61% of these unauthorized activities occurred ***after*** Wadland's May 9, 2025 conversation with Ms. Chapin – in which he (falsely) reaffirmed his understanding of his confidentiality and non-disclosure obligations to the Company. (*See id.* ¶ 14.)

Notably, Delinea's investigation revealed that Wadland had not simply

---

[2] From mid-August to September, 2025, Delinea personnel invested substantial time and resources responding to and investigating Wadland's unauthorized access to Delinea's Confidential Information, including at least 50 hours from the Security Operations team to forensically trace and analyze Wadland's misappropriation and over 40 hours from Delinea's Vice President of Engineering to analyze activity logs and evidence of Wadland's conduct, which investigation costs well exceed $5,000. (Boettcher Decl. ¶ 25.)

4082762.6

8

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

viewed select locations within the Company's system, but had methodically *downloaded and exported some of the most sensitive materials* from the Fastpath system, relating to the operational capability of the platform and its models, **risk framework and rulesets** – which are all Confidential Information.  (Boettcher Decl. ¶ 15.)  Specifically, Wadland accessed and/or downloaded the core frameworks for each of Delinea's four major **modules** in Fastpath Assure.  (*Id.* ¶ 16.)



(*Id.*)

(*Id.*)

(*Id.*)  In addition, Wadland accessed eight different Fastpath tenant platforms, which are individual production platform types that Fastpath develops to be offered for customer use.  Each tenant platform accessed contained eight different **integrations**.  Each integration was custom built by Delinea for each production module type.  (*Id.*)  The data set that can be imported from the integration could be extrapolated to determine how Delinea processes data and displays it in reports for customer use.  (*Id.*)

The frequency and duration of Wadland's unauthorized intrusions are also deeply concerning.  Delinea's investigation revealed that between April 14, 2025 and August 12, 2025,

(Boettcher Decl. ¶ 17.)  APIs are a way for one program to interact with another.  (*Id.*)[3]

---

[3] In comparison,

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████    ████████████████████████████████████ in the Fastpath Assure product. (*Id.* ¶ 18.) The Delinea reports are competitively sensitive as they depict the model and framework that control the security assignments and other useful data that a customer could track and utilize to understand the security of their business enterprise. (*Id.*) On some days, Wadland would spend over **three hours** accessing and reviewing Fastpath records. (*Id.* ¶ 19), and on June 17, 2025, he accessed the Fastpath integration framework for **over eight hours**. (*Id.*)

Overall, the record of Wadland's unauthorized, post-termination intrusions into the Fastpath Assure platform indicate that he methodically and strategically examined and misappropriated Confidential Information representing Delinea's most valuable and sensitive information relating to Fastpath Assure. (Boettcher Decl. ¶ 21.) As just one example, activity logs show that he accessed customer tenants with the most popular integrations with the Fastpath Assure product (e.g., the most popular enterprise resource planning or customer relationship management systems used by Delinea customers, including ████████████████████████ ████████████████████████████████████████████ ████████████████████████. (*Id.*) Each of these integrations took Fastpath over 6 months to build, and required 48+ months of development work, equating to over $20 million in investment resources. (*Id.*) Wadland also accessed four major module offerings in the Fastpath Assure product (e.g., ████████████████ ████████████████████████████████████). (*Id.*) Fastpath invested substantial resources and time in creating these modules, which took over 20 years to develop. (*Id.*) The last decade of investment and development of the Fastpath

████████████████████████████████████████████████████████████. (*Id.* ¶ 17.)

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO
SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Assure web application cost approximately $54 million dollars in investment resources.  (*Id.*)

Finally, Delinea's investigation indicates that the Confidential Information improperly accessed and copied by Wadland is being used (or easily could be used) by Saviynt to unfairly compete with Delinea.  Wadland was recruited and hired by Saviynt to work as a Senior Director, Product Management in Saviynt's Application Access Governance group, which is focused on creating an access governance and control product across business applications such as Oracle, Workday, and Microsoft Dynamics 365 – in direct competition to Delinea's Fastpath Assure platform.  (Cassady Decl. ¶ 10.)[4]   The activity logs reviewed in the investigation confirm that Wadland's account surreptitiously accessed Delinea's systems from locations that include ***an IP address registered to Saviynt*** in El Segundo, California. (Boettcher Decl. ¶ 22.) ████████████████████████████████████████████████████████████████████. (*Id.*)  Saviynt does not currently possess a competing product for this feature.  (*Id.*)  Wadland's unauthorized access would allow him to share the frameworks explaining how Delinea built this product, thereby harming Delinea's competitive advantage.  (*Id.*)[5]

_____

[4] In his "About" section on his public Linkedin account, Wadland acknowledged that he "worked at Delinea where he led the product strategy and roadmap for the Fastpath Assure Platform, focusing on cross-application separate of duties (SoD) and change tracking."  (*See* Cassady Decl., Ex. 6.)  Wadland simultaneously represents in his "Experience" section that he is currently working in Saviynt's Application Access Governance group on essentially the same functions, in a group that "detects access control violations proactively" across application ecosystems. (*Id.*)

[5] Wadland also accessed the Company's systems from IP addresses in Southern California not far from Saviynt's headquarters in El Segundo, including an IP addresses registered to the Regus Business Center LLC in Woodland Hills, California, and an IP address registered to AT&T Enterprises LLC in Irvine,

4082762.6

11

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

In sum, Delinea's investigation revealed that while employed by Saviynt, and by utilizing (in part) Saviynt's IP address, Wadland made numerous unauthorized downloads and copies of Delinea's Confidential Information – including an extensive amount of proprietary reports and integration data that can be made operational, which would be extremely valuable to a competitor who could, if provided such copies of the software, use, replicate, or exploit it, to Delinea's detriment.  (Boettcher Decl. ¶ 24.)

## III.    THE COURT SHOULD GRANT THE TEMPORARY RESTRAINING ORDER AND ISSUE THE OSC

### A.    Legal Standard

The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction.  *Google LLC v. Point Fin., Inc.*, No. 5:25-CV-04033-BLF, 2025 WL 1616533, at *2 (N.D. Cal. June 6, 2025) (citing *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017)).  "A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 (9th Cir. 2021) (citation omitted).

Here, Delinea is likely to succeed on the merits of its claims, and will continue to suffer irreparable harm from Defendants' unlawful acts without immediate injunctive relief.  In contrast, Defendants will suffer no undue hardship from the issuance of a temporary TRO.

California.  (Boettcher Decl. ¶ 23.)  The May 6, 2025 intrusion from the IP address in Woodland Hills accessed ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████  *(Id.)*  The June 12, 2025 intrusion accessed ████ ████████████████████████████  *(Id.)*

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**B.      Delinea is Likely to Prevail on the Merits of Its Claims.**

Delinea is, at a minimum, likely to succeed on the merits on at least three of its causes of action relevant here: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*; (2) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1861 *et seq.*, and (3) breach of contract.

**1.      Delinea is Likely to Succeed on its Computer Fraud and Abuse Act Claim.**

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, imposes liability for anybody who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer if the conduct involved an interstate or foreign communication," 18 U.S.C. § 1030(a)(2)(C), or who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value," *id.* at §1030(a)(4). "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g).

For purposes of a civil action, there is a minimum requirement of $5,000 of "loss," but "loss" is defined broadly to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11); 1030(g).[6]

---

[6] The cost of discovering the identity of the offender or the method by which the offender accessed the protected information is also considered part of the loss for purposes of the CFAA. *See SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008).

13

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Here, Delinea is likely to prevail on its CFAA claim because it easily satisfies each of the necessary elements.  First, Delinea's computers are "protected computers" under the CFAA because Delinea customers access its products online or using a mobile application from states in which the company has no servers.  (*See* Boettcher Decl. ¶ 12); *see* 18 U.S.C. § 1030(e)(2)(B) (a "protected computer" is a computer "which is used in or affecting interstate or foreign commerce or communication").

Second, it is indisputable that Defendant Wadland was no longer authorized to access Delinea's computers once he resigned his position – and he was certainly not authorized to access Delinea's computer while employed by competitor Saviynt, using a device with an IP address registered to Saviynt.  It is well-established that even employees who had authorized access to protected computers lose that authorization upon termination of employment.  *See Weingand v. Harland Fin. Sols., Inc.*, No. 11-3109, 2012 WL 2327660, at *3 (N.D. Cal. June 19, 2012) ("[I]f a former employee accesses information without permission, even if his prior log-in information is still operative as a technical matter, such access would violate the CFAA."); *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 829 (N.D. Cal. 2014) (noting that "weight of current authority supports" interpretation of CFAA that "computer access is unauthorized or exceeds authorization under the CFAA when a person has authorization under an employment arrangement, but then changes jobs, and the computer's owner has not disabled that person's access through technological controls"); *see, e.g.*, *Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC*, No. 8:23-CV-01903-JVS-KESX, 2024 WL 1699509, at *11 (C.D. Cal. Mar. 28, 2024) (finding CFAA violation where "more than a week after [defendant's] employment with [employer] ended and thus after his authorization to use the computer had expired" but had nevertheless "remove[d] client files from a work computer").

Third, the evidence is overwhelming that, while employed by Saviynt,

4082762.6

14

Wadland did in fact repeatedly access Delinea's computer system – without Delinea's knowledge or consent – in order to repeatedly view, download and export Delinea's trade secrets and Confidential Information relating to the Fastpath Assure product. As described above, the frequency, duration, and scope of Wadland's unauthorized intrusions are significant: Delinea's investigation indicates he accessed the Fastpath system on **at least 31 distinct days**, to ███████████████ ████████████████████ from the Fastpath Assure user interface, ███████ █████ in the Fastpath Assure product, and ████████████████████ from the product. (*See* Boettcher Decl. ¶¶ 14, 17-18.)

Fourth, Delinea has satisfied the requisite $5,000 loss amount in light of the substantial time and resources spent to uncover and investigate Defendants' misconduct. (*See* Boettcher Decl. ¶ 25 (describing resources and cost spent in investigation)); *see also Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016) (explaining that employee "hours, totaling more than $5,000 in costs, analyzing, investigating, and responding" to defendant's unauthorized access); *Accretive Specialty Ins. Sols., LLC*, 2024 WL 1699509, at *12 (company "hours, totaling more than $5,000 in costs, analyzing, investigating, and responding" to defendant's computer intrusion was a "loss" under the CFAA).

Finally, as Wadland's employer, Saviynt is liable for his tortious actions, given that they were undertaken while he was a Saviynt employee, during normal working days and working hours, through the use (in part) of Saviynt's company devices / IP address, and for the ostensible benefit of Saviynt, a direct corporate competitor of Delinea. As set forth above, Wadland's unauthorized intrusions into the Delinea computer system amounted to a wholesale taking of substantially all the content needed to replicate or duplicate the product for Saviynt, which is focused on creating a similar product in direct competition to Delinea as part of the product group Wadland was recruited to manage. There was no individual value to Wadland from this misappropriation; the clear and reasonable inference is that this

4082762.6

15

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

information was taken for Saviynt's benefit. Conversely, given the nature and extent of the information improperly accessed and taken by Wadland, Saviynt cannot plausibly contend that it believed Wadland independently developed this volume of competitive work product in the mere four-plus months of his employment at Saviynt. Under these circumstances, Saviynt is liable for Wadland's improper accessing and misappropriation of information from Delinea's computer system. *See, e.g., NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014) ("[A]n employer can be vicariously liable for an employee's violations of the CFAA if those transgressions occur in the scope of employment or the employer directs the employee's conduct." (collecting cases)) .

## 2. Delinea is Likely to Succeed on its Misappropriation of Trade Secrets Claim.

The Defend Trade Secrets Act ("DTSA") requires "a plaintiff to show that it possessed a trade secret, that the defendant misappropriated the trade secret, and that the defendant's conduct damaged the plaintiff." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019). A "trade secret" includes financial, business, or economic information where the owner has taken reasonable steps to keep the information secret, and where the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). As defined in the DTSA, misappropriation means the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret," while "improper means" includes "theft," "misrepresentation," and "breach of a duty to maintain secrecy." 18 U.S.C.

4082762.6

16

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

§ 1839(5)-(6).

Delinea has a clear likelihood of success with respect to each of these elements. First, the evidence of Wadland's misappropriation is co-extensive with the evidence of improper computer accessing above. Delinea has shown that Wadland, only one week after his resignation to work for Saviynt – and without Delinea's knowledge or consent – systematically and methodically accessed Delinea's systems on repeated occasions over a nearly four-month period, in order to review and/or download voluminous amounts of competitively sensitive, trade secret information. (*See* Boettcher Decl. ¶¶ 14, 17-18.)

Moreover, Wadland did so while employed by Saviynt (a competitor), during normal business hours, while using a device with an IP address registered to Saviynt, to obtain competitive information that reasonably only benefitted Saviynt, as Delinea's corporate competitor. (Boettcher Decl. ¶ 22.) Under such circumstances, Saviynt is liable for its employee's acts of misappropriation. *See, e.g.*, *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1057 (N.D. Cal. 2020) (employer may be vicariously liable for its employee's misappropriation of trade secrets where the employer and plaintiff "operate in the same industry" and the court may "reasonably infer" that the employee stole the information to benefit the employer); *SolarCity Corp. v. Pure Solar Co.*, No. CV1601814BRODTBX, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016) (employer's motion to dismiss trade secret misappropriation claim denied where the plaintiff "sufficiently allege[d] that [the employee] was acting within the scope of his employment . . . when he committed the alleged misappropriations in order to gain additional customer sales leads for [the employer]").

Second, the computer information improperly accessed, reviewed and downloaded by Wadland indisputably contained Delinea's trade secrets. As described above, the improperly accessed and downloaded materials included the Fastpath Assure system's core trade secrets, including its integrations, risk

4082762.6

17

framework and rulesets, and major modules.  This competitive information is not known outside the Company; Delinea invested years and many millions of dollars developing this valuable and sensitive competitive data; and if this information fell in the hands of a competitor, it would significantly harm Delinea's competitive advantage by permitting competitors to save substantial time and cost that they otherwise would have to expend to develop the information on their own. (Boettcher Decl.  ¶¶ 7, 21.)  This competitively sensitive information therefore "derives independent economic value" because it is the culmination of millions of dollars of investment and multiple years of strategic development and training.  (*See* Boettcher Decl. ¶¶ 7, 21.)

Third, Delinea took at least reasonable measures to keep its confidential information secret, including by implementing technical processes to safeguard its data and requirements that employees and customers sign restrictive confidentiality agreements.  (*See supra* Part II.C; Boettcher Decl. ¶¶ 8-9); *see, e.g.*, *Posdata Co. v. Kim*, No. C-07-02504RMW, 2007 WL 1848661, at *7 (N.D. Cal. June 27, 2007) (in TRO context, finding plaintiff's use of confidentiality agreements and internal security measures constituted reasonable measures to protect trade secrets).

Finally, Defendants' trade secret misappropriation harmed and will continue to harm Delinea, given the independent economic value of the stolen data, the diminished value of the proprietary data, the loss of Delinea's competitive advantage, the loss of business and goodwill, and the irreparable harm to Delinea's business – which Wadland already acknowledged in his agreement.  (*See* Chapin Decl., Ex. 1 at 2 (Wadland acknowledging that unauthorized disclosure "could irreparably injure the business of the Company.").)  As district courts have explained, trade secret misappropriation can result in irreparable harm because "it may prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred." *Waymo LLC v. Uber Techs.*, Inc., No. C 17-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017); *see*

4082762.6

18

*also WeRide Corp.*, 379 F. Supp. 3d at 853-54 ("It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm.").

Under these circumstances, numerous courts have found a sufficient likelihood of success on the merits for a misappropriation claim under the DTSA. *See Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *7, *9 (finding a likelihood of success where a company provided "compelling" evidence that an employee had "pilfered over 14,000 files" along with an initial showing that "at least some" of the misappropriated information "likely qualifies for trade secret protection") *see also Hub Grp., Inc. v. Ortiz*, No. 5:21-CV-00517-JWH-KK, 2021 WL 4555820, at *3 (C.D. Cal. Apr. 13, 2021) (finding a likelihood of success where a current company employee emailed confidential information to a former employee now employed at a direct competitor). Here, as in *Waymo* and *Ortiz*, Delinea has made a substantial showing that Wadland misappropriated competitively sensitive data from Delinea for the benefit of his new employer and Delinea's competitor, Saviynt. (*See* Cassady Decl. ¶ 10; Boettcher Decl. ¶¶ 22-23.)

**3.    Delinea is Likely to Succeed on its Breach of Contract Claim.**

To prevail on its breach of contract claim against Wadland, Delinea must prove: (1) the existence of the contract; (2) Delinea's performance or excuse for nonperformance; (3) Wadland's breach; and (4) injury to Delinea because of the breach. *Bodenburg v. Apple Inc.*, 146 F.4th 761, 767 (9th Cir. 2025) (citing *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011)).

All elements are easily satisfied here. As described above, Defendant Wadland entered into numerous confidentiality and non-disclosure agreements with Delinea (and its predecessor Fastpath) during his employment at the company. (*See* Chapin Decl., Exs. 1-5.) Wadland cannot credibly dispute the existence of those enforceable contracts (the first element) or Delinea's performance of its obligations under those contracts (the second element), given Delinea compensated him during

4082762.6

19

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

his tenure at the company.

Turning to the third element, Wadland plainly breached these numerous agreements, which required him to protect and safeguard Delinea's confidential information and trade secrets. (*See* Chapin Decl., Ex. 1 (CIAA) at 2, 9; Ex. 2 (Fastpath Employee Handbook) at 10-11, 19-20; Ex. 3 (Delinea Employee Handbook) at 21, 22; Ex. 4 (Delinea Code of Conduct) at 18.) As described in detail above and in the submitted declarations, Wadland perpetrated a brazen campaign of corporate theft spanning several months, which escalated in activity *after* he resigned from the company on April 14, 2025 when compared to his activity metrics *during* his employment at Delinea.

Fourth, Delinea suffered injury as a result of Wadland's breach. First, Wadland acknowledged in his agreement that unauthorized disclosure of confidential information "could irreparably injure the business of the Company." (*See* Chapin Decl., Ex. 1 at 2.) Second, Delinea has suffered and will continue to suffer irreparable harm to its competitive advantage and other injuries, as described below, from Defendant Wadland's breach of his agreements. Thus, Delinea has established a strong likelihood of success on the merits of its claim for breach of contract. *See, e.g.*, *Edwards Lifesciences Corp. v. Launey*, No. 8:23-CV-00304-WLH-ADSX, 2023 WL 4680774, at *4 (C.D. Cal. June 12, 2023) (finding a likelihood of success on the merits where defendant "transmitted confidential information to himself prior to leaving the company" in violation of employment agreements); *Tesla, Inc. v. Khatilov*, No. 4:21-CV-00528-YGR, 2021 WL 624174, at *2 (N.D. Cal. Jan. 22, 2021) (granting TRO after finding "substantial likelihood" of success on misappropriation and contract claims where defendant transferred 26,377 files "to his personal cloud storage account").

**C.    Delinea Will Suffer Irreparable Harm Unless Defendants are Enjoined.**

Delinea has suffered and will continue to suffer irreparable harm as a result of

20

Defendants' conduct. As noted, Wadland acknowledged in his agreement that unauthorized disclosure of confidential information "could irreparably injure the business of the Company." (*See* Chapin Decl., Ex. 1 at 2.) It is well-settled that "when a defendant contractually agrees that his breach would cause irreparable harm, courts may consider this concession further evidence of irreparable harm." *Mechanix Wear LLC v. Branson*, No. 2:24-CV-03090-RGK-AJR, 2024 WL 2846068, at *4 (C.D. Cal. Apr. 23, 2024); *see also Ikhana Grp., LLC v. Viking Air Ltd.*, 2023 WL 7348411, at *12 (S.D. Cal. Nov. 7, 2023) (collecting cases).

Second, courts in the Ninth Circuit "routinely find a likelihood of irreparable harm when an employee takes trade secrets to a competing business." *Mechanix Wear LLC*, 2024 WL 2846068, at *4; *see also Waymo LLC*, 2017 WL 2123560, at *10-11. As noted, Wadland was recruited and hired by Saviynt to work as a Senior Director, Product Management in Saviynt's Application Access Governance group, which is focused on creating an access governance and control product in direct competition to Delinea's Fastpath Assure platform. (Cassady Decl. ¶ 10, Ex. 6.) Wadland's social media confirms his role at Saviynt in a substantially similar capacity as his role at Delinea (*see* Cassady Decl., Ex. 6 (LinkedIn screenshots)). And his access of Delinea's records from a Saviynt IP address leads to an undeniable inference that Delinea is suffering irreparable harm due to Defendants' misconduct. Immediate injunctive relief is critical where, as here, the misappropriated confidential information would give a competitor a competitive advantage and harm Delinea's own ability to compete. (*See* Cassady Decl., Ex. 6 (LinkedIn screenshots); Boettcher Decl. ¶¶ 7, 22.)

**D.    The Balance of Hardships Weighs Heavily in Favor of Delinea.**

The balance of equities also strongly favors Delinea. As discussed above, the harm to Delinea is substantial. (*See supra* Section III.C.) Conversely, Defendants will suffer no injury as Delinea is simply asking for Defendants to comply with the law and the binding agreements entered between the parties, the requested TRO is

4082762.6

21

temporary and the restraints are minimal.  *See Mechanix Wear LLC*, 2024 WL 2846068, at \*5 (concluding that the enjoined defendant "will suffer no harm by complying with the law and his contractual obligations"); *Ortiz*, 2021 WL 4555820, at \*4 (balance of equites favored plaintiff where "the TRO is only temporary and the restraints on [defendant] are relatively minimal since she will only be restrained from using [plaintiff]'s information").

### E.    The Public Interest Favors Injunctive Relief

Finally, the public interest favors Delinea's request for immediate injunctive relief.  "[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer," and the "[p]ublic interest is also served by enabling the protection of trade secrets."  *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016).  Where, as here, a party has shown that it meets all other grounds for the issuance of a temporary restraining order, "it follows that the public's interest in these circumstances favors an injunction 'specifically focused' on [defendants'] use of any misappropriated trade secrets."  *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1210 (E.D. Cal. 2020).

### F.    Delinea Should Not Be Required to Post a Bond

Delinea is asking that Defendants temporarily be restrained from misappropriating Delinea's trade secrets and Confidential Information and that Defendants return property they have no right to possess.  Consequently, Defendants will have no cognizable costs or damages as a result of the relief requested, such that a bond is not required.  *See Comet Techs. U.S. of Am. Inc. v. Beuerman*, No. 18-cv-1441, 2018 WL 1990226, at \*6 (N.D. Cal. Mar. 15, 2018) (bond not required for injunctive relief that "simply enjoin[s] Defendant from doing something Defendant never had a right to do in the first place").

### G.    Delinea's Requested Relief

Delinea respectfully requests the relief set forth in the Proposed Order

4082762.6

22

Granting Plaintiff's Motion for TRO:

    A.    A TRO to temporarily restrain and enjoin Defendants Wadland and Saviynt from their unlawful actions, which include (but are not limited to): (1) accessing or attempting to access Plaintiff's proprietary computer network; and (2) directly or indirectly using, disclosing, copying or retaining any of Plaintiff's Confidential Information or trade secrets; and

    B.    An Order to Show Cause why a Preliminary Injunction should not issue, regarding the same.

## IV.   CONCLUSION

For the reasons set forth above, Delinea respectfully requests that the Court issue (1) the Proposed Temporary Restraining Order and (2) the Proposed Order to Show Cause regarding a Preliminary Injunction on an urgent and expedited basis.

DATED:  September 23, 2025

Ekwan E. Rhow
Paul S. Chan
Alexander H. Tran
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By: _____
    Paul S. Chan
    Attorneys for Plaintiff Delinea Inc.

4082762.6

23

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO
SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Delinea Inc., certifies that this brief contains 6,788 words, which:

☒ complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated _____.

DATED: September 23, 2025

_____
Paul S. Chan

4082762.6

PLAINTIFF DELINEA'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE